Legacy R.T., Incorporated v. Harter. Mr. Beverly. Good morning, Your Honors. My name is Jay Beverly. I represent the appellant, Chris Harter. We have two main issues that I would like to address, time permitting. First, did the trial court err in granting summary judgment against Mr. Harter when there were multiple fact issues, including conflicting evidence on the main fact issue of whether Mr. Morgan approved Mr. Harter's salary in the years 2009 and 2010, and a lot of other related fact issues regarding the course of dealing between Mr. Harter and Legacy. And second, were Legacy's claims barred by limitations, where there was evidence showing that the injury here was not inherently undiscoverable? On the summary judgment claim for Legacy, we believe that the district court failed to apply the correct summary judgment standard of review, determine contested fact issues, made a credibility determination, essentially decided who should win when there clearly were contested issues of genuine fact, and the summary judgment in favor of Legacy should be reversed. On the limitations issue, the injuries were not inherently undiscoverable, not or objectively verifiable as required by the Texas rule, discovery rule, and the existence of the alleged fiduciary relationship here is not enough to save Legacy's claims under the facts of this case, and we believe the court should reverse and render on the limitations claim. With respect to the fact issues that precluded summary judgment on Legacy's claim and in reviewing Legacy's claim. You're relying on Harter's, your client's, affidavit primarily to create the fact issue on liability? Correct. And you can't just have self-serving conclusory affidavits. What explanation does he give for why what he claims was authorized increases in salary? Why those occurred only during the relatively narrow window of time when he was in charge of the books? That is explained by the fact that the workload that he was under was increasing during that period of time. If you look at what was going on during that period of time in, I believe, September of 2000, beginning in 2009 and into 2010, Legacy was expanding their restaurant brand. As the evidence shows, they have the Ninfas brand and the original Antones brand. They were expanding that brand into other states. In September of 2010, they opened a new Ninfas. I believe that one's in Glendale, Arizona. In November, they opened a new concept restaurant, Taberna, and I believe that one's in Scottsdale, Arizona, and then another Taberna in Beverly Hills in April of 2011. So that's three new restaurants, not only in different cities but in different states, within a period of eight months. That is a major increase in his workload during that period. Where in his declaration is he looking right now? That is actually at 208 and 209 in the statements that they were required to give to the court regarding what work justified his salary. Well, and what explanation does he give for why the increases were so random, and he'd get an increase and then it'd stop, and, I mean, for the randomness of the increases? What he says is that he discussed all of those with Mr. Morgan. Mr. Morgan approved those on an as-needed basis and that he's not, Mr. Harder's not a sophisticated financial guy. He went to college, did not graduate from college, and that every one of those was discussed and every one of those was approved by Mr. Morgan. And then when he did not need the additional. But why were they done in that manner? Does he give a reason for why they were so random? Usually you get a salary bump. Your salary continues at that new level or you get a bonus at a certain time period every year. I mean, this is, you know, the other side does a good job of explaining how random this all was. It does look random. I will agree with that. But what Mr. Harder is unequivocal about is that every one of these was approved and he discussed each one of them with Mr. Harder. This is a small company. Keep in mind this is a small company. They have five or six employees. They may not do things according to standard business practices that larger companies would do. But the holding company itself, obviously the restaurant companies below employ a lot of folks, but the holding company itself is four or five person operations. How are those particular draws, I'll call them draws, excessive draws that is above the base salary from time to time, how are they causally related to any other event other than any event that explains them? You said it generally will increase workload. That is his explanation. If you look at the original letter of intent, it talks about. I don't see that those particular draws necessarily corresponded to that eight-month period. Well, I mean, obviously that's when those restaurants open. Obviously there is a lot of work to be done. I understand that. That's an explanation of when they increase workload. But then you look at the particular drawdowns above salary, they don't necessarily seem to have any direct causal link. Well, the explanation is the increased workload and also, as he said, his family's financial obligations, and also the fact that he was being required to commute from Houston to various other places during this time period. So he was the workload, the commuting, and he also talks about family financial obligations. What's the total sum of money above the salary that's in dispute here? I believe it's around $130,000, something in that range, over the course of two years. I know it's about $30,000 for 2009 and around $100,000 for 2010. What's the temporal range? What's the span of time? Spans, I believe, from around the first or second quarter of 2009 to the end of 2010. The explanation for why it stops in 2011 is Mr. Harder tells Mr. Morgan that he's going to leave the company in January of 2011. Mr. Morgan brings someone else in. Is that a two-year spread? I'm not sure I've got the book end of that time. It's slightly less than two years, yes. But in 2011, he tells him, I'm going to leave the company. At that point, he ceases asking for, as could be expected, ceases asking for any advice. But there was a significant amount of time when he was there, and I think at one point the accounting firm was handling this and at other points. So it's just coincidence that the only times when he had financial troubles at home or he had this extra work at the office was when he happened to be in control of the books. Yes. That's his story. That is his story, yes. With respect to the fact issues regarding that, though, I mean, the essential fact issue is, did Legacy approve his salary? And did Mr. Harder and Legacy continue to operate under the letter of intent, which by its own terms expired in November of 2007 and which by its own terms contemplates an initial salary and does not say that that salary is going to be the salary for all time? And also are there any details? I mean, when I look at his discussion, he says, Morgan acknowledged to me that he knew of my additional compensation. Morgan acknowledged he knew. I mean, there's no details about where they met, what was said. There are details. And, of course, there's no paper documentation approving any of this. That is correct. We were very limited in what discovery we could do. What did your client claim? There was some paperwork that documented this? I think he was not in charge of his e-mail account after he left. But that's not necessarily in the record. But there are numerous fact issues, which we've detailed in our reply brief. Their basic context, their basic argument is that it makes no economic sense, which is, I think, what you're getting at. What does the record show with regard to the documentation of the authorization for these additional monies? The record shows that all of the payments are recorded in legacies records in multiple ways, in the QuickBooks, in the accounting records, and in the franchise tax. Not the franchise tax. I'm sorry, the quarterly tax reports. Those are evidences of the amount of money that he took. My question, though, is what's the documentation, if any, with regard to the authorization? Or is that all oral? It is all oral. As I said, it's a small company in which they don't have strict operating procedures or anything like that. So it is oral. It was conversations. But the amounts of money that were drawn down were not round dollar amounts. It's not like $20,000 here and $10,000 there. What he would do is he would temporarily increase the amount registered in QuickBooks. I think this just shows his lack of sophistication on financial matters, but would temporarily increase the amount of his salary in QuickBooks, which would generate an extra payment, and then decrease it back when he did not need the extra money. Sir? You're saying that his position, the oral approval, was of this sort of non-script number? In other words, as you're thinking about it, he says, okay, I need an extra $5,000. Okay, you got it. But your client says, I need an extra $1,242.24 kind of iteration. And you're saying that's the way the approval occurred? I don't think that's specifically the way the approval occurred. What the approval occurred was that I'm going to take some extra money. It's going to be reflected in the books. Clearly, Mr. Morgan had access to all of the records. He could see what was being taken. He could see whether it was going to be approved or not. Extra money or a stated sum? I think the extra money, not necessarily a stated sum. The way he did it, as I said, was he would increase. One of the things that struck me is the amount of money sold was $123,557.58. It just seems to be kind of odd to say, Neal, or whatever his name was, I recall. Well, it may be odd. He needs the extra money. But you add up all those monies, and you come up with these odd. The take on each one of those checks also was a very precise kind of amount. Well, it may be odd, but that's exactly why I think summary judgment was inappropriate here. I'm just trying to understand. That's an open legal question, but I'm trying to understand what is the fact issue. Other than his statement, I have permission. What is the basis for that? I'm looking for any kind of confirmation of his claim of authorization. That's not determinative, but I'm trying to understand what this is really about. I understand. Basically, the record is that they had a close working relationship, that the offices were right next door. All this information was shared. There was nothing hidden. Everything was open and obvious as to what was going on. The owner of the man was seldom in the place. I'm sorry, Your Honor? I misunderstood the record. I thought that the founder here was away a great deal of time, was not there next door working side by side. No, the testimony is that they had separate addresses, but they shared a common courtyard so that the offices were essentially side by side there. So there's not this great separation during the entire period. They would see each other two or three times a week? We said they continually discussed the finances. They met regularly to discuss the finances, cash balances, cash flows. All those things were done on a regular basis. There's no indication that Mr. Morgan was the absentee type of owner that he claims he was. That goes to only a few minutes left here, a few seconds actually left. I want to ask you on the discovery rule, which is probably what you want to get to. Right. The Texas Supreme Court in the SV case, that terrible child abuse case, Correct. Doesn't it say that when there's a fiduciary involved that the misconduct is inherently undiscoverable and then the only question becomes when the misconduct becomes apparent? I think if you go back to kind of the seminal case on this, which is the course view, the Phillips Petroleum case, the Texas Supreme Court has a different take on that, which is not reversed or challenged in any way in the SV case. Admittedly, terrible facts. But in the course view case. What year is that case? That is a 1957 case cited in there. Don't we have to cite the most recent Texas Supreme Court pronouncement? Yes, they do. But I think there's nothing in there indicating that course view has been overruled in any way and course view continues to be cited by courts. Well, it says we have twice held, and this would be the third time in SV, that a fiduciary's misconduct is inherently undiscoverable. You don't think that's the law? Which then kicks in the discovery rule. What they said in course view was that some intermediate courts have said, yeah, fiduciary rule, that's it, you don't have to look any further. And others have said, no, you look differently. But what they say in course view is it's more accurate to say that the existence of a relationship of trust and confidence does not change the rule that diligence in discovering the fraud is required but does affect the application of the rule, and that they're not prepared to say that one in a relationship of trust and confidence is always justified as a matter of law in neglecting every precaution until something occurs. Do you mind telling that you should have known prior to June the 6th of 2010? Correct. Based on all of the documentation which is in the record showing that the amount of compensation that Mr. Harder was receiving was clearly all available there. Do you have any cases since SV, I guess it's been about 20 years, any Texas cases that apply the new or should have known standard when a fiduciary is involved? There's the, I'm not sure it's before or after SV, but there's the Computer Associates v. Altai case. That's actually in 94, so I guess before. But in that case, the Supreme Court talks about the rationale for the fiduciary duty rule, and the rationale being that the fiduciary is presumed to have more knowledge than the party that is owed the fiduciary duty. And they talk about that's a presumption but not a hard and fast rule, and that the person owed the fiduciary duty does have some responsibility to look into these matters. When you look at the cases where it seems to be more hard and fast rule, you're talking about like in SV, the parent-child relationship, or in the Willis v. Maverick case, the attorney-client relationship, or a trustee-beneficiary relationship, where there really is this kind of unequal knowledge, unequal power. I don't think you have that in the context of this type of closely held company where there's clear evidence. Are you saying that no fiduciary relationship, or are you saying that the actual discovery rule that normally attends a fiduciary relationship is inoperable? I think you can assume for purposes of the argument that there was a fiduciary relationship here. But I think you have to you can't just say fiduciary relationship, that's the end of it. They don't have to do anything. They can sit back and wait until they have actual knowledge. No, you have to look at the facts. As I understand it, all of the information was in the QuickBook program, which the founder and owner did not really know how to operate or access. So in other words, it seems to be strong evidence of a trust relationship in a fiduciary. But if there's a fiduciary relationship, why wouldn't the actual discovery be the controlling inquiry? Because I think you have to look at the context of each situation. I don't think you can just say fiduciary relationship. Are you saying that you certainly would have to do that to determine if there is a fiduciary relationship. But beyond that, what are you saying? Beyond that, I'm saying if there is a fiduciary relationship, you have to look at the facts and circumstances of each case to determine whether the benefited party should have known, whether there was information that came to their light that they should have known. It should have known the standard for a given fiduciary relationship, or is it actual? I think it should have known. The Supreme Court has said that in several cases, including the Courseview case, including the Computer Associates case. It's not a strict actual knowledge standard. And the reasons for that are based on looking at each individual situation. And when you look at the facts here, Mr. Harder's testimony is pretty clear on how involved Mr. Morgan was in this company, that he was involved in pretty much all of the decision making that there was made. In fact, even when you look at what he says about how he allegedly discovered this in October of 2011, is he was having his controller do a salary review, a payroll review, so he could determine what salary increases were going to be. So that's how involved he was. He made most all of the decisions. If you maintain that, that would be a jury question. Correct. All right. What time do I have left? Well, you've reserved your rebuttal time. We had questions, so you still have your rebuttal time intact. Thank you. All right. Mr. Dove? May it please the Court, I'm Chris Dove for Legacy RG, Inc. I simply don't think that there is any need to empanel a jury to weigh the damning facts, as this Court has ascertained they are. I'm not going to belabor how odd, how fishy they look, how bereft of any reasonable explanation other than embezzlement there would be, but I will address a couple of things that were said by Mr. Beverly in the opening argument. He says that the explanation for these things was that he had an increased workload and had to begin commuting. There's two problems with this explanation. First, it does not explain the fishiness of the payment. It explains why he wanted more money. And secondly, it strikes me that you have a very strong argument about how credible the matter is, but it sounds like you're arguing credibility. It's pretty tough to get, you know, his testimony that I had authorization straightforward under oath should raise a fact question, shouldn't it? Why isn't that enough here? I think the answer to that question, Judge Higginbotham, comes in the analysis the Supreme Court gave in Matsushita. In many cases, the fact that somebody says, no, that's not true, creates a fact question. What Matsushita teaches, though, is you don't take the testimony at face value. You take it in light of the full context of the undisputed facts. It could not be. Essentially, that's what it amounts to, that, yes, if somebody's naked statement is just defined by physical facts, et cetera, et cetera, yes, that's been a phenomenon. But this is an individual that's been described as having a personal relationship between the two and that he did get authorization and that he gave it to me. And you're saying that it couldn't have been. Why is that? Because under Matsushita, the question is not did Mr. Morgan authorize the payments. The question is taking into account all of the things that don't make sense, the things where Matsushita says you must come forward with more persuasive evidence to support their claim than would otherwise be necessary. In light of that, you have to ask can a jury reasonably believe that on 20 occasions, solely during the time when he had absolute control over the payroll system, he went to Mr. Morgan and said, I need some extra money. May I please alter the base salary calculation in QuickBooks so that I get an extra $3,846.16? Or I know that you have given me over $300,000 in documented loans. I need more money. Can I just give myself an extra paycheck this month? And I promise I won't do this again once you have somebody else watching the payroll system. That is what must be weighed under the summary judgment standard. And frankly, I don't think the district judge erred by saying that cannot be believed by a jury of six reasonable citizens. Shouldn't y'all be 12, incidentally. Never give up on 12. I think once it comes down to that, and it truly is the central question of this case, it truly does resolve the merits of Legacy's claims against Carter, and it is the explanation for why limitations has to be analyzed the way that it is. You know, I guess the enigma for me is not disputing anything that you've said, but just having seen my share of cases, by the time all this energy is spent on the summary judgment motion, trips to the Fifth Circuit, et cetera, this looked like to me a real short trial. I mean, you know, by the time you tee this thing up and, you know, put on the witnesses who really know anything about it, pull the documents up, et cetera, et cetera, you're on to arguing credibility. You know, so, I mean, just it's like give people a firm trial date and try this thing. Try this thing in a day and a half, it's done, as opposed to a quickie summary judgment, which is not to say you're not right on facts, but just, you know, you're not up and down the ladder of Rule 56. Did he construe the evidence in a light most favorable to the non-movement? You know, how explicit need the affidavit be? You know, is it self-serving? I mean, the trial judge calls him a thief, you know, so I'm like, ah. You see what I'm, so I'm, you know, I guess I'm, this is just a cathartic statement. It's not a question. So you don't have to answer it, okay. Chief Judge, I would love to answer, and certainly this panel yesterday made a point of noting that each of you have been on the trial. I have a footnote to the Chief's comment. You know, the four most powerful words a trial judge has is that, and when lawyers are going back and forth, it's a very simple thing. I learned it, you know, from a lawyer. It's called call your first witness. And that has a way of just changing the landscape and getting on with it. And that's also the shortest distance between these things. Then, if I may, let me give an impassioned defense of the summary judgment rule. I think in this case, in retrospect, I think there was always going to be an appeal to the Fifth Circuit, so that's a sunk cost. And I think the panel agrees that it made sense for us to file a summary judgment motion, because as we sat there, we thought, I can't imagine what Chris Harder is going to say to defend these actions. The judge gives it to you. I don't blame you for not handing it back to him. But sometimes you're surprised when a judge gets a summary judgment. You move a summary judgment tactically, and you say, oh, my God, he granted it. I'm at a little bit of a disadvantage in that you have all been trial judges and know how you administer a trial docket. My defense in absentia of Judge Hughes. If the judge would have tried this case, the chief was in a day and a half. He would have maybe tried it in half a day. I mean, I know he puts serious limits on trials. But Your Honor knows that Judge Hughes also is a fan of not letting things get out of hand and applying the summary judgment rule absolutely as written without bending it one iota to free his docket of nonsense. And I don't mean to be inflammatory to Mr. Beverly. I think he has done an outstanding job defending what I believe to genuinely be indefensible. I don't fault Judge Hughes for taking a look at this motion and saying, I believe I have something better to do with six people's time and my own time and the attorney's fees paid by both sides to go down and get ready for this case and to try it and what have you. I think that is a valid goal for the court. I think it is entirely reasonable. When you have the extraordinary case, certainly Judge Higginbotham, in most cases. Guys, you can try the case in three days if you pre-tried it. But anyway, that's the end of that. It doesn't really answer the question. We're kind of pulling you around a little bit, but that's okay. I think it is a fair point. Why don't you try this? Convince us that there's a way to say that the facts were construed in light, most favorable to the non-moving and still get to where you want to be. I think the way that you write that opinion is to say, under Matsushita, we are instructed we do not construe Mr. Harder's bare testimony in the light most favorable. We construe all of the undisputed facts in the light most favorable. We will construe these odd furtive payments of $3,846.16 in Mr. Harder's favor. We will construe the fact that this never happened when anyone else had their eyes on the payroll system in his favor. And still, we cannot believe that a juror would say, you know what, I think that's actually what happened. That's how the opinion is written. If I could, I'd like to move on to the limitations question, because Mr. Beverly has raised this question about what is the proper standard under Texas law. And I think, Judge Costa, you had it exactly right. The SVK says, we have twice held a fiduciary's misconduct to be inherently undiscoverable. The reason underlying both decisions is that a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so, relying not on the Coarse View case, relying on two other cases. Coarse View is not to the contrary. It is an older case that uses more archaic language, what it says citing the same Slay v. Burnett trust case that is cited in SV. On the other hand, and I hope I get the pronunciations right here, limitation does not begin to run in favor of a trustee and against the sestui until the latter has notice of a repudiation of the trust, and there is no duty to investigate at least until the sestui has knowledge of facts sufficient to excite inquiry. It is the same principle, and I cannot fathom a circumstance in which you would make the determination, which is conceded here, as it was not in the trial court, fiercely disputed in the trial court, that Mr. Harder was a fiduciary. Under what circumstance can you imagine, well, you are a fiduciary, but now I have some duty to look over your shoulder. That is the very opposite of the definition of a fiduciary. Once you have established that this is Texas law and that there is no exception to it, there is no factual way of avoiding it, and I believe this court must, that wraps up the limitations argument very tidily. There is a tremendous amount of argument that there were these documents from which Legacy might have ascertained that he was paying himself too much. The problem here is, first of all, under SV, under course view, under any of these cases, there is no obligation to go ferret out what your fiduciary is doing. And secondly, for Legacy to have had the actual knowledge that right in front of its face, necessary to create limitations beginning, it has to have also been by somebody that knew what Harder was supposed to be paid. And it is undisputed that the only people that knew that were Morgan and Harder. The rest of the people employed by Legacy did not know what the boss made. So had they looked down and seen an extra paycheck or a paycheck that was for more than 1 52nd of $275,000, they would not have known that. The first time they have anything that even arguably creates a question on that is a tax form that was signed by Mr. Morgan within the limitations period. They have also cited that there were some Texas Workforce Commission filings. Even Harder himself does not testify that Morgan saw them, and we have given the explanation why. He generated these reports. They were filed by QuickBooks, and then the resulting reports were sent back to Mr. Harder. Now, the fact that he was in one building, Mr. Morgan is in another building, that is not actual knowledge. That is access to knowledge, the same thing that is insufficient under SB. Based on these principles, we think that this Court should affirm. I understand that if you were to reverse, you think we could have a quick trial. I didn't discover it, ultimately. Having been accused of not following the summary judgment standard, I will be careful and say it is alleged that we should have known, based on this tax form that was signed on January 20, 2010. It is Mr. Morgan's testimony that it came to light after Mr. Harder left the company, months passed, and because they were going to reevaluate salaries, he instructed the controller to make a list of what had been paid to various employees. She generated that list. Mr. Morgan looked at it and said, why on earth is Mr. Harder being paid in this way? That's extraordinary. This was many months after Mr. Harder had already left. I believe that tells the whole story. What was the occasion for that summary analysis, that reexamination of the book? What prompted that? Mr. Morgan's testimony is that he was considering whether he needed to go through and increase salaries to keep them in pace with the market, presumably, and that that was what spurred him to say, I want to make sure I know who is making what in the legacy company. That was the first time that he decided to ask that question? It is his testimony that, yes, that is the first time. He had entrusted that to his fiduciary, Harder, who had been in charge of the salaries, had been in charge of running the company. How long had he departed the company before that? Before that date? He was the sole shareholder of the company going back. No, I take it that he had terminated the relationship with his president or CEO. It's not clear who was the CEO here. I don't think they seem to know. He was already out of the company, and then he went back and looked at it? That is correct. It was a period of some months, four or five months, I believe. And had a new president been selected, or was he running it? The record does not reveal that a new president had or had not been named. How did he gain access? Somebody else did it for him with a quick thing. He just simply asked to generate this, and they quickly generated it for him. That's correct. Okay. If this was the outright theft, your client and the district judge saw it as, was there a criminal referral in this matter? I don't believe there was. If the panel has no further questions, I will yield back my time. All right. Thanks, sir. I appreciate your responses. All right. Back to you, Mr. Beverly. Thank you, Your Honor. I'll be very brief. With respect to the Matsushita case, that is an antitrust case in which the economic sense rule, as it is termed by Mr. Dove, is applied to say that other conspiracies cannot make, because it did not make economic sense for them to predatorily price in the U.S. market. That rule definitely applies in an antitrust case, and I think it's been rather loosely used by some other courts, just kind of taking the words economic sense out of place and plugging it in saying something must make economic sense. Economic sense in the context of an oxymoron. That is what Professor Grubbs at the University of Texas may have taught me in my macroeconomics course. But with respect to just plucking out those words economic sense and putting them down into this case, I don't agree that that's the correct analysis necessarily, but I do believe that Mr. Harder did provide an explanation of why he was getting these extra payments. With respect to the idea that only actual knowledge suffices, I do not believe that is the rule with respect to the intersection of fiduciary duty and the discovery rule. Numerous cases say that it's still a no or should have known standard based on the facts and circumstances of those cases. If you're in the attorney-client situation, if you're in the parent-child situation, if you're in the trustee-beneficiary situation, perhaps a different rule, perhaps the actual knowledge rule should apply. But when you're sitting here— I think it's an apparent knowledge that S.V. It doesn't say actual. It says it has to have become apparent that there is an offense. Yes. Everything here was apparent. There was absolutely no attempt to hide anything. Judge Cross, as you pointed out, if they claim he's a thief, he's got to be the most incompetent thief there is around because— There's a lot of those. Yeah. Well, there are, but generally they're not running companies like this. Everything that showed the exact amount of what he was paid was there in the records. There was absolutely nothing hidden. They make no claim of fraudulent concealment. And when you look at the evidence of Mr. Morgan's involvement in this company, I think it is unreasonable to say that he can just sit back, put his head in the sand, not worry about anything, and then after limitations runs, apparently easily discover what he claims is the actual injury here. And all he had to do was ask another employee to go run a QuickBooks report, and there was the evidence of the injury right in front of him. So under those circumstances, I think a no or should have known standard should apply in the context of the discovery rule. But the reason you have a fiduciary in the financial context is you trust that person with the books. I mean, that's the whole point of a fiduciary. You're entrusting them with the books. Therefore, you shouldn't have to worry about it. But that's not what the evidence—the evidence shows that that is not the entire extent of the relationship here. The evidence showed that— In fiduciaries, there's a sliding scale of how trusted they are, but I'm not really sure that—I mean, the debate's always are you a fiduciary or are you not? I don't know about this sliding scale once you're in the fiduciary world. I think the Courseview case says that the fiduciary relationship is a factor to be taken into consideration of whether the injury is or is not inherently undiscoverable. And I think if you're going to take the fiduciary relationship into account, you have to look at the nature of the particular fiduciary relationship. Is that one where you're just totally entrusting everything to somebody else? Or is it a situation like this where that clearly is not happening, where Mr. Morgan clearly is still— He's sort of a fiduciary is what you're saying. Sort of a fiduciary. That may be a way to put it. But he may be a fiduciary, but not everything is being entrusted to him. It's not a case where everything has been turned over and entrusted to him. Mr. Morgan is still involved. We ask that the Court reverse the summary judgment and grant—render the case on the basis of limitations. Thank you for your time. All right. Thank you.